# EXHIBIT 1

FILED DATE: 7/12/2021 3:58 PM   2021L007046

FILED
7/12/2021 3:58 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2021L007046

14005401

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| JEFF MANNING, | ) | |
| | ) | |
| Plaintiff, | ) | No.: 2021L007046 |
| | ) | |
| v. | ) | |
| | ) | |
| JPMORGAN CHASE BANK, N.A. d/b/a | ) | **JURY DEMAND** |
| CHASE BANK | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Jeff Manning (herein "Manning" or "Plaintiff") by his attorneys, Burke Burns & Pinelli, Ltd. as and for his Complaint against JPMorgan Chase Bank, N.A. d/b/a Chase Bank (herein "Chase" or "Defendant"), states as follows:

## GENERAL ALLEGATIONS

1.      Jeff Manning ("Manning") is a resident of the City of Chicago, State of Illinois and the owner of OnTapp Media, LLC, an Illinois corporation, which does business as "Abby Apples", a children's clothing online boutique.

2.      Upon information and belief JPMorgan Chase Bank, N.A. d/b/a Chase Bank ("Chase") is an American national bank headquartered in Manhattan, New York City, with branch locations in the City of Chicago, State of Illinois.

3.      Venue is proper in Cook County, Illinois because Chase has a significant number of branch locations in Cook County and as the location of a significant number of the actions described herein.

4.      Jurisdiction is proper in this Court as Chase transacts business in the State of Illinois.

1

FILED DATE: 7/12/2021 3:58 PM    2021L007046

5.     On or about November 12, 2017, Manning entered into a contract, the Cardmember Agreement with Chase for personal account and a corresponding Chase card ending in 2889. See the Cardmember Agreement, a copy of which is attached hereto as **Exhibit A**.

6.     Beginning on or about November 12, 2017, Manning made purchases on this Chase card and has since been in good standing with respect to this account by making timely payments and his contractual obligations pursuant to said cardholder agreement.

7.     On or around the end of 2019 and the beginning 2020, the Covid-19 Corona Virus pandemic began, starting in the Far East and spreading to other parts of the world. The Covid-19 Corona Virus pandemic had an impact on shipping and manufacturing, among other impacts.

8.     Due to the pandemic and the shutdown of transportation between counties, both by air and by water, there existed a significant delay in the shipping of products from foreign markets to the United States and for the expected arrival of products paid for and shipped from said foreign markets.

9.     On or about May 2020, Manning conducted an internal audit that uncovered over twenty-one thousand (21,000) non-delivered items that were charged to Manning's Chase card for products shipped from China.

10.     On or about May 28, 2020, Manning contacted Chase via phone regarding these non-delivered items and spoke with a representative from the Chase Dispute Department who instructed Manning to upload documentation via the Secure Message Center through the Chase online banking portal. Manning was told to wait approximately three weeks before any action would be taken due to the volume of the disputes as the 21,000 plus non-delivered items represented 1,453 unique charges to Manning's Chase credit card.

11.     On or about June 1, 2020, Manning uploaded documentation to the Secure Message

FILED DATE: 7/12/2021 3:58 PM   2021L007046

Center through the Chase online banking portal.

12.    On or about June 4, 2020, Manning contacted the Chase Dispute Department and was notified by a representative that there was no record of any communication from Manning in the Secure Message Center.

13.    On or about June 8, 2020, Manning visited a Chase Branch located at 3335 N. Ashland Ave. Chicago, IL 60657 in Chicago, Illinois (herein "Chase Bank - Ashland") and spoke with Chase Representative Adam Blake (herein "Blake"). Manning provided Blake via email the documentation regarding the non-delivered items and Blake confirmed via email that he forwarded it onto his Business Relationship Manager.

14.    On or about June 10, 2020, Blake contacted Manning via phone and instructed Manning to write a summary of the disputes on the standard Chase dispute letter, to sign the letter, and to return the letter to Blake.

15.    On or about June 12, 2020, Manning returned the signed Chase dispute including a written summary of the disputes.

16.    Due to the volume of disputes, on or about June 14, 2020, Blake instructed Manning to complete one dispute letter and to include a note explaining that an attached digital document would contain the full list of disputed charges. Because of the large number of transactions, from the very beginning of the interactions with both Blake and Chase's Dispute Department, Manning emphasized to that it was important to get precise instructions on all data points needed to properly file the dispute, so that all of the needed information could be collected at once as opposed to piecemeal.

17.    On or about June 15, 2020, through June 22, 2021, Manning continued to contact Blake via email for updates regarding the disputes, however, Manning received no reply.

FILED DATE: 7/12/2021 3:58 PM    2021L007046

18.     On or about June 22, 2020, Manning contacted the Chase Dispute Department and spoke with a representative who indicated that the Dispute Department only had a record of one dispute for a total of $54. The Representative stated that they had no record of documentation regarding the 21,000 plus non-delivered items nor did they have a record of the approximately 1,400 disputed charges.

19.     On or about June 26, 2020, Manning received an email notification regarding a new letter in his Secure Message Center stating that a single dispute for $53.90 on June 20, 2020, was denied. Manning forwarded Blake the email notification regarding the single dispute and questioned Blake about why only one dispute appeared to be logged in the system. Manning received no response from Blake.

20.     On or about June 24, 2020, Blake instructed Manning to call Branch Escalations Department and provided Manning with a contact telephone number.

21.     On or about June 26, 2020, Manning received an email from Blake stating that Blake will follow up with his superiors regarding the disputes.

22.     On or about June 29, 2020, Manning contacted the Chase Dispute Department to inquire about the status of the disputes. The Dispute Department Supervisor informed Manning that the Secure Message Center was down, that any messages sent through this Center would not be opened indefinitely and to consider anything previously submitted via the Secure Message Center to be lost. The Supervisor suggested that the documentation regarding the disputes be sent through a Chase branch via fax and provided a fax number.

23.     On or about June 29, 2020, Manning contacted Blake via email requesting assistance in sending the fax. Manning continued to follow up with Blake via email requesting receipt confirmation but received no reply.

4

FILED DATE: 7/12/2021 3:58 PM    2021L007046

24.     On or about July 2, 2020, Manning revisited Chase Bank - Ashland and spoke with Blake who confirmed that the documentation had been faxed. However, Manning was informed that the party receiving of the fax stated that the documentation was illegible. At Manning's direction and in response to the statements made by Blake, approximately eight hundred (800) pages of documentation were sent via UPS directly from and by the Chase Bank - Ashland branch to the corporate Chase Dispute Department on the same date.

25.     On or about July 7, 2020, Manning spoke with a Representative from the Chase Branch Escalations Department who ensured Manning that the disputed charges would be taken care of shortly.

26.     On or about July 8, 2020, Manning had a conference call with the Branch Escalations Representative and Blake who discussed a plan for resolving the disputes. At no point did Manning receive an update from the Branch Escalations Representative regarding the resolving of these disputes.

27.     On or about July 15, 2020, Blake contacted Manning via email stating that Manning would be contacted by Theresa Wolf (herein "Wolf") from Branch Escalations Department, however, Manning never received said call.

28.     On or about July 15, 2020, Manning contacted Card Services via phone and spoke with Chase Dispute Department Supervisor Christina (herein "Supervisor Christina"). Supervisor Christina indicated that the Dispute Department had a problem with associating the disputed amounts with the corresponding charges on the account.

29.     On or about July 17, 2020, at the request of Supervisor Christina, Manning went back through all 21,000-plus items over again, and this time mapped the disputed amount with the associated charge on the statement (i.e. if a charge was for $200 and Manning received $150 of

FILED DATE: 7/12/2021 3:58 PM    2021L007046

goods but $50 of goods were missing, Manning only disputed $50, not the full $200. Chase stated they needed to know exactly which charge each dispute was associated with). Manning further resubmitted this documentation to Blake and the Chase Secure Message Center and asked for confirmation that this would be the final piece of information that was required for his claim. In response, Manning received a confirmation message from the Secure Message Center and from Blake stating that a delayed response of a week or more should be expected, and Supervisor Christian confirmed that this was the only missing information needed.

30.  On or about July 18, 2020. Manning received a secure message from Chase stating that Chase will no longer be contacting Manning about his "recent concern" while providing no details on why or which concern was being referenced.

31.  On or about July 22, 2020, Manning contacted the Chase Dispute Department to verify that the resubmitted documentation was received. However, Manning was informed that such documentation was never received.

32.  Upon recommendation from a Dispute Department Representative, on or about July 23, 2020, Manning went to Chase Bank – Ashland to reprint the dispute details and shipped the documentation to the Dispute Department on July 23, 2020 via UPS.

33.  On or about July 30, 2020, Manning spoke with Wolf who indicated that it appeared that Manning properly submitted the documentation. Wolf further indicated that she had done everything she could, and that her last resort was to escalate the case to the Chase Executive Office.

34.  On or about August 3, 2021, Wolf informed Manning that a representative from the Chase Executive Office would contact him within two business days, however, at no point did a representative reach out to Manning.

35.  On or about August 6, 2020, Wolf contacted Manning and provided contact

FILED DATE: 7/12/2021 3:58 PM    2021L007046

information for the Chase Executive Office, namely Dalaiah Coleman (herein "Coleman"). Manning contacted Coleman via phone and left a voicemail.

36.　　On or about August 10, 2020, Manning provided the two versions of the documentation to Coleman via email. Manning was notified that such documentation was insufficient as it did not provide the street addresses of the recipients of the packages which were the focus of the disputes. At no point prior to this notification was Manning instructed to include the street addresses of the recipients in such documentation. As a result, Manning was required going through 21,000-plus order receipts and retrieve the street addresses of every order recipient.

37.　　On or about August 10, 2020, Manning received a system generated message on the Chase Secure Message Center stating that Manning's request is unable to be fulfilled. However, Coleman notified Manning that system generated messages should be ignored as the Executive Office is handling the case.

38.　　On or about August 31, 2020, Coleman contacted Manning and assigned Manning a case number ECW200625-01515-R1.

39.　　On or about September 4, 2020, Coleman informed Manning that the Chase Dispute Department required an additional revision to the documentation Manning provided, namely that the documentation must reflect an exact description of the missing goods including color, size, sex, and description of each missing article of clothing. Upon such request, Manning included the description for each of the non-delivered items in excess of twenty-one thousand (21,000-plus). This is the third time that Chase Bank, in one form or another, claimed additional information was needed even though each previous time, Manning asked (in collaboration with Chase representatives) if all information that was needed was finalized and were told yes.

40.　　On or about September 9, 2020, Coleman provided an update to Manning stating

7

FILED DATE: 7/12/2021 3:58 PM    2021L007046

that she received the documentation but could not confirm whether the Chase Dispute Department received the documentation.

41.    On or about September 10, 2020, Manning sent an email to Blake, Coleman, and Wolf, including a summary of the correspondence between Manning and Wolf.

42.    On or about September 10, 2020, Manning visited the Chase Bank – Ashland branch to print the third revision of the dispute details and shipped the documentation to the Dispute Department via UPS. Further, Manning provided a copy of the documentation to Blake.

43.    On or about September 17, 2020, Manning contacted Blake via email requesting an update regarding the disputes. Blake informed Manning that he sent an inquiry to Coleman, Wolf, and the Chase Escalation Department.

44.    On or about September 17, 2020, Manning contacted Coleman via email stating that the tracking information regarding the documentation showed that the package was delivered successfully. However, when Manning contacted the Chase Dispute Department, representatives could not confirm whether the documents had been received even though documents for disputes are typically scanned within two business days.

45.    On or about September 22, 2020, Manning contacted Wolf via email for an update on the dispute resolution. Manning did not receive a response.

46.    On or about September 22, 2020, Manning contacted Coleman via email after Manning discovered that Chase was opening disputes against the wrong merchant, namely "1&1," as all of the disputes opened by Manning was against one merchant, namely "AliExpress."

47.    On or about October 8, 2020, Manning spoke with Coleman who stated that Chase senior management is involved in resolving this case and that Manning had provided sufficient documentation as required by law governing credit card disputes. Coleman further stated that

Manning had properly submitted the information, and that in the event the dispute department did not process the disputes, Chase would be able to "write-off" the disputes to compensate Manning.

48.     On or about October 20, 2020, Manning spoke with Coleman in which they discussed the original timeframe for the delivery of the items. At this time, Coleman suggested that the Chase Dispute Department could use the initial date Manning expressed his intent to dispute charges as the date of initial contact, namely May 28, 2020.

49.     On or about October 22, 2020, Manning notified Coleman that he had retained legal counsel concerning the resolution of these disputes.

50.     On or about October 23, 2020, Manning contacted Coleman, requesting a specific point of contact for counsel to communicate with, however, Manning received no reply.

51.     On or about November 5, 2020, Manning forwarded documentation to Coleman evidencing that the initial contact date with Chase was May 28, 2020.

52.     On or about November 13, 2020, Coleman contacted Manning informing Manning that credits were being issued and that he should expect to see a significant amount of refunds showing up on his account in the November 2020 and December 2020 Chase bank statements.

53.     On or about December 1, 2020 through December 29, 2020, Manning emailed Coleman on three separate occasions, however, Manning never received a response to any of these emails.

54.     On or about January 7, 2021, Manning contacted the Chase Executive Office to speak with Coleman and was told that she would call Manning back by the end of the business day. Manning never received such call.

55.     On or about January 8, 2021, Manning sent a fourth email to Coleman and did not receive a response.

FILED DATE: 7/12/2021 3:58 PM    2021L007046

FILED DATE: 7/12/2021 3:58 PM    2021L007046

56.    On or about January 11, 2021, Manning contacted the Chase Executive Office via phone to speak with Coleman. During this call, Manning was notified that Coleman was out of the office and that another representative would call him back within forty-eight (48) hours.

57.    On or about January 18, 2021, Manning attempted to reach the management from the Chase Executive Office, and Manning was informed by a representative that the dispute would be escalated to the Executive Office. Manning was further informed that a representative from the Executive Office would reach out to him within the week.

58.    On or about January 20, 2021, Manning received a call from Coleman. During this call, Manning was Ms. Coleman stated that she wanted to touch base but did not have any updates or new information for Manning and was told to "simply be patient."

59.    On or about February 3, 2021, Manning received a call from Coleman in which Coleman stated that $86,000 had been credited to Manning's Chase account, however, Coleman could not provide a reason why the remaining disputes were not processed and credited back to Manning's account. Coleman further stated that she would follow up with Manning that Friday, February 5, 2021, about why the disputes were not credited. Manning never received a call or email on this date.

60.    On or about February 17, 2021, Manning received a call from Coleman in which she stated that from her perspective, the Chase Executive Office was considering Manning's case a closed case.

61.    On April 14, 2021, an attorney from the undersigned firm received correspondence from Chase Executive Office regarding the status of the resolved and unresolved disputes. See the April 14, 2021, Chase Executive Office Letter, a copy of which is attached as **Exhibit B**. Pursuant to said letter: "Of the disputed amount of $195,249.19 listed on your client's spreadsheet, credit

10

FILED DATE: 7/12/2021 3:58 PM    2021L007046

adjustments totaling $86,185.06 have been made to your client's account." **Ex. B**, ¶2. The letter further states that "The merchant requires more time respond to the information provided" and that "If his dispute is correct, your client's credits will become permanent. If the Merchant proves that the charges are correct, we will reverse the temporary credits and your client will be responsible for the charges." **Ex. B**, ¶3.

62.     Of the remaining $109,064.13 in charges not receiving at least a temporary reversal, ¶4 of the April 14, 2021 letter states as follows: "We have determined we are not able to dispute other charges listed in the spreadsheet. Several charges do not match our records, cannot be located in our system, or occurred beyond the time frame we are able to take action." **Ex. B, ¶4**.

63.     Thereafter, on April 27, 2021, undersigned counsel spoke to "James" from the Executive Office per the directions of the April 14, 2021, letter. During this conversation, which was recorded by Chase, undersigned counsel requested certain information from "James" including a determination of exactly what reversals have been made permanent, what reversals were still pending final and permanent approval, a list of the claims that Chase was unable to dispute, and the specific reason why Chase was unable to dispute said claims, among certain other information.

64.     Chase was not able to provide this information either orally over the phone, nor did they indicate they could provide any of this information to undersigned counsel at a later date as they (paraphrasing) "Did not have that information."

65.     As of the drafting of this Complaint, of the disputed amount of $195,249.19 claimed by Manning for products that were never delivered wherein Manning was seeking credit adjustments, $86,185.06 reversal/credit adjustments have been made with no determination by Chase of whether those adjustments are permanent. Manning's claim for a refund/reversal of the

11

FILED DATE: 7/12/2021 3:58 PM    2021L007046

remaining $109,064.13 in charges has been denied for reasons that Chase will not specify.

## COUNT I
## BREACH OF CONTRACT

66.     The allegations in Paragraphs 1 through 65 are incorporated by reference in Count One as if fully restated herein.

67.     On or about November 12, 2017, Manning entered in the written Chase Card Member Agreement wherein Manning fully complied with all provisions of the card member agreement entered into by and between the parties. **Ex. A**.

68.     Manning fully performed all obligations required of him under the terms of the card member agreement, including notifying the Defendant in writing within sixty (60) days after the errors appeared on his statement.

69.     Defendant, in failing to definitively and permanently resolve the disputed 1,453 unique charges which contained over 21,000 non-received items, breached the clear and explicit terms of the written Card Member Agreement requiring the Defendant to, within ninety (90) days of receiving the written communication regarding the disputes, to resolve said error by correcting the error or explaining why the billing statement is correct.

70.     Manning has demanded resolution of these disputes, namely continuously contacting the Defendant and its representatives, totaling the sum of $195,294.19 owed to Manning.

71.     Defendant's failure to resolve the disputes within ninety (90) days of the written communication from Manning represents a breach of the Card Member Agreement by Defendant.

72.     As a direct and proximate result of the Defendant's breach of the Card Member agreement, Manning has sustained a loss and damages in the amount of $109,064.13 in charges that have been denied for reasons that Chase will not specify and $86,185.06 in reversal/credit

12

FILED DATE: 7/12/2021 3:58 PM   2021L007046

adjustments have been made with no determination by Chase of whether those adjustments are permanent as of the date of filing this complaint.

WHEREFORE, the Plaintiff Jeff Manning prays for judgment in his favor and against the Defendant JPMorgan Chase Bank, N.A. d/b/a Chase Bank for a sum in excess of the jurisdictional limit of $50,000 as evidence establishes, a declaration by the Defendant as to the permanency of the credit reversals that have already occurred, reasonable attorney's fees, plus statutory pre-judgment and post-judgment interest as will fairly and reasonably compensate Manning for the damages he sustained, plus the cost of this action.

**COUNT II**
**VIOLATION OF FAIR CREDIT BILLING ACT**

73.     The allegations in Paragraphs 1 through 72 are incorporated by reference in Count Two as if fully restated herein.

74.     On or about May 28, 2020, Manning contacted Chase via phone regarding these non-delivered items and spoke with a representative from the Chase Dispute Department who instructed Manning to upload documentation via the Secure Message Center through the Chase online banking portal. Manning was told to wait approximately three weeks before any action would be taken due to the volume of the disputes as the 21,000 plus non-delivered items represented 1,453 unique charges to Manning's Chase credit card.

75.     Per the directions of the Defendant, on or about June 1, 2020, Manning uploaded documentation to the Secure Message Center through the Chase online banking portal.

76.     On or about June 10, 2020, Blake contacted Manning via phone and instructed Manning to write a summary of the disputes on the standard Chase dispute letter, to sign the letter, and to return the letter to Blake. Per the instructions of the Defendant's representative, Blake returned the executed letter on June 12, 2020.

FILED DATE: 7/12/2021 3:58 PM    2021L007046

77.     On or about June 29, 2020, Manning contacted the Chase Dispute Department to inquire about the status of the disputes. The Dispute Department Supervisor informed Manning that the Secure Message Center was down, that any messages sent through this Center would not be opened indefinitely and to consider anything previously submitted via the Secure Message Center to be lost. The Supervisor suggested that the documentation regarding the disputes be sent through a Chase branch via fax and provided a fax number.

78.     Manning contacted Blake via email requesting assistance in sending the fax. Manning continued to follow up with Blake via email as to whether the fax was sent but received no reply.

79.     On or about July 2, 2020, Manning revisited Chase Bank - Ashland and spoke with Blake who confirmed that the documentation had been faxed. However, Manning was informed that the party receiving of the fax stated that the documentation was illegible. At Manning's direction and in response to the statements made by Blake, approximately eight hundred (800) pages of documentation were sent via UPS directly from and by the Chase Bank - Ashland branch to the corporate Chase Dispute Department on the same date.

80.     In addition to the electronic and facsimile transmittals of dispute documentation made by Manning at the direction of the Defendant and/or Defendant's representative as detailed herein, Manning sent via UPS hard copies of the dispute documentation on July 27, 2020, and again on September 11, 2020.

81.     Defendant, in failing to definitively and permanently resolve the disputed 1,453 unique charges which contained over 21,000 non-received items within sixty (60) days of receiving the written communication regarding the disputes, violated the Fair Credit Billing Act. 15 U.S.C. § 1601 et seq.

14

FILED DATE: 7/12/2021 3:58 PM    2021L007046

82.     At all times there existed The Fair Credit Billing Act, Section 15 U.S.C. §1666,

Part D, which states as follows:

(a)    WRITTEN NOTICE BY OBLIGOR TO CREDITOR; TIME FOR AND
CONTENTS OF NOTICE TO CREDITOR; TIME FOR AND CONTENTS OF
NOTICE; PROCEDURE UPON RECEIPT OF NOTICE OF CREDITOR:

If a creditor, within sixty days after having transmitted to an obligor a statement of
the obligor's account in connection with an extension of consumer credit, receives
at the address disclosed under section 1637(b)(10) of this title a written notice (other
than notice on a payment stub or other payment medium supplied by the creditor if
the creditor so stipulates with the disclosure required under section 1637(a)(7) of
this title) from the obligor in which the obligor—

(1) sets forth or otherwise enables the creditor to identify the name and account
number (if any) of the obligor,
(2) indicates the obligor's belief that the statement contains a billing error and the
amount of such billing error, and
(3) sets forth the reasons for the obligor's belief (to the extent applicable) that the
statement contains a billing error,

the creditor shall, unless the obligor has, after giving such written notice and before
the expiration of the time limits herein specified, agreed that the statement was
correct—

(A) not later than thirty days after the receipt of the notice, send a written
acknowledgment thereof to the obligor, unless the action required in subparagraph
(B) is taken within such thirty-day period, and
(B) not later than two complete billing cycles of the creditor (in no event later than
ninety days) after the receipt of the notice and prior to taking any action to collect
the amount, or any part thereof, indicated by the obligor under paragraph (2)
either—

(i) make appropriate corrections in the account of the obligor, including the
crediting of any finance charges on amounts erroneously billed, and transmit to
the obligor a notification of such corrections and the creditor's explanation of
any change in the amount indicated by the obligor under paragraph (2) and, if
any such change is made and the obligor so requests, copies of documentary
evidence of the obligor's indebtedness; or
(ii) send a written explanation or clarification to the obligor, after having
conducted an investigation, setting forth to the extent applicable the reasons
why the creditor believes the account of the obligor was correctly shown in the
statement and, upon request of the obligor, provide copies of documentary
evidence of the obligor's indebtedness. In the case of a billing error where the
obligor alleges that the creditor's billing statement reflects goods not delivered
to the obligor or his designee in accordance with the agreement made at the

15

FILED DATE: 7/12/2021 3:58 PM    2021L007046

time of the transaction, a creditor may not construe such amount to be correctly shown unless he determines that such goods were actually delivered, mailed, or otherwise sent to the obligor and provides the obligor with a statement of such determination.

83.     At all times there existed The Fair Credit Billing Act, Section 15 U.S.C. § 1640, which states as follows:

(a)     INDIVIDUAL OR CLASS ACTION FOR DAMAGES; AMOUNT OF AWARD; FACTORS DETERMINING AMOUNT OF AWARD

Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this part, including any requirement under section 1635 of this title, subsection (f) or (g) of section 1641 of this title, or part D or E of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—

(1)     any actual damage sustained by such person as a result of the failure;
(2)     (A)(iii)… in the case of an individual action relating to an open end consumer credit plan that is not secured by real property or a dwelling, twice the amount of any finance charge in connection with the transaction, with a minimum of $500 and a maximum of $5,000, or such higher amount as may be appropriate in the case of an established pattern or practice of such failures;…

84.     As indicated by the voluminous communications and actions made in good faith and initiated by Manning as detailed herein, Manning has complied with his obligations under 15 U.S.C. § 1666 of the Federal Credit Billing Act.

85.     Defendant has not complied with their obligations of providing a timely resolution to the 1,400 plus claims for reversals pursuant to 15 U.S.C. § 1666 et al.

86.     As a direct and proximate result of the Defendant's multiple violations of The Fair Credit Billing Act, Manning has sustained actual damages as detailed in this Complaint.

87.     As a direct and proximate result of the Defendant's multiple violations of The Fair Credit Billing Act, Defendant is civilly liable to Manning in relation to the approximately fourteen hundred (1,400) disputes per Section 15 U.S.C. § 1640 et al of the Act.

FILED DATE: 7/12/2021 3:58 PM    2021L007046

WHEREFORE, the Plaintiff Jeff Manning prays for judgment in his favor and against the Defendant JPMorgan Chase Bank, N.A. d/b/a Chase Bank for a sum in excess of the jurisdictional limit of $50,000 as evidence establishes, reasonable attorney's fees, civil penalties as required by The Fair Credit Billing Act as evidence establishes, established plus statutory pre-judgment and post-judgment interest as will fairly and reasonably compensate Manning for the damages he sustained, plus the cost of this action.

Respectfully submitted,

**JEFF MANNING**


By: ___/s/Christopher J. Hales_____
One of His attorneys


Vincent D. Pinelli
vpinelli@bbp-chicago.com
Christopher J. Hales
chales@bbp-chicago.com
**BURKE BURNS & PINELLI, LTD.**
70 W. Madison Suite 4300
Chicago, Illinois 60602
(312) 541-8600
Firm ID 29282

17

FILED DATE: 7/12/2021 3:58 PM   2021L007046

## VERIFICATION

Under penalties as provided by law pursuant to 735 ILCS § 5/1-109, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters herein stated to be made upon information and belief and as to such matters the undersigned certifies as aforesaid that she verily believes the same to be true.

State of Illinois
County of DuPage

Subscribed and sworn to
before me this 30 day
of June ___, 2021.

OFFICIAL SEAL
JOSEPH SKUTAS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:07/30/24

Notary Public

18

FILED DATE: 7/12/2021 3:58 PM     2021L007046

## CARDMEMBER AGREEMENT RATES AND FEES TABLE

### INTEREST RATES AND INTEREST CHARGES

| | |
|---|---|
| **Purchase Annual Percentage Rate (APR)** | **17.49%** to **24.99%**. This APR will vary with the market based on the Prime Rate.[a] |
| **Balance Transfer APR** | **17.49% to 24.99%.** This APR will vary with the market based on the Prime Rate.[a] |
| **Cash Advance APR** | **26.49%.** This APR will vary with the market based on the Prime Rate.[b] |
| **Paying Interest** | Your due date will be a minimum of 21 days after the close of each billing cycle. We will not charge you interest on purchases if you pay your entire balance by the due date each month. We will begin charging interest on balance transfers and cash advances on the transaction date. |
| **Minimum Interest Charge** | None |
| **Credit Card Tips from the Consumer Financial Protection Bureau** | To learn more about factors to consider when applying for or using a credit card, visit the website of the Consumer Financial Protection Bureau at http://www.consumerfinance.gov/learnmore. |

### FEES

| | |
|---|---|
| **Annual Membership Fee** | $95 |
| **Transaction Fees** | |
|    Balance Transfers | Either **$5** or **5%** of the amount of each transfer, whichever is greater. |
|    Cash Advances | Either **$10** or **5%** of the amount of each transaction, whichever is greater. |
|    Foreign Transactions | **None** |
| **Penalty Fees** | |
|    Late Payment | Up to **$39**. |
|    Return Payment | Up to **$39**. |
|    Return Check | **None** |

**Note:** This account may not be eligible for balance transfers.

**How We Will Calculate Your Balance:** We use the daily balance method (including new transactions). See Interest Charges section in this Agreement for more details.

**Billing Rights:** Information on your rights to dispute transactions and how to exercise those rights are included in this Agreement. See Your Billing Rights section for full details.

**Penalty Fees:** A single violation of each type will not exceed $28. However, if another violation of the same type occurs within six monthly billing periods we will charge up to the maximum fee in the table above. The Late Payment and Return Payment fees will not exceed the related minimum payment that was due.

**Minimum Payment:** We will calculate the minimum payment as the larger of: 1) $35 (or total amount you owe if less than $35); or 2) the sum of 1% of the new balance, the periodic interest charges, and late fees we have billed you on the statement for which your minimum payment is calculated.

**Prime Rate:** Variable APRs are based on the 4.75% Prime Rate as of December 31, 2019.

[a] We add 12.74% to 20.24% to the Prime Rate to determine the Purchase/Balance Transfer APR (daily periodic rate currently 0.04792% to 0.06847%). Maximum APR 29.99% (daily periodic rate 0.08217%).

[b] We add 21.74% to the Prime Rate to determine the Cash Advance APR (daily periodic rate currently 0.07258%). Maximum APR 29.99% (daily periodic rate 0.08217%).

**MILITARY LENDING ACT NOTICE:** Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: the costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account). To receive this information and a description of your payment obligation verbally, please call 1-800-235-9978.

EXHIBIT A

EXHIBIT A

COL00081

FILED DATE: 7/12/2021 3:58 PM 2021L007046

# WELCOME TO CHASE

## YOUR CARDMEMBER AGREEMENT

EXHIBIT A



# WELCOME TO YOUR ACCOUNT

Review and save the following important information about your account. This document together with the Rates and Fees Table is an agreement between you, the cardmember, and JPMorgan Chase Bank, N.A., a subsidiary of JPMorgan Chase & Co. If you have any questions, please call us using the number on the back of your card. Chase has agreed to lend you money as described in this agreement, and you agree to pay us back together with interest charges and fees. Your use of the account or any payment on the account indicates your acceptance of the terms of this agreement. If any fee in the Rates and Fees Table is marked none, the section of this agreement that relates to that fee does not apply.

## GETTING STARTED: YOUR ACCOUNT
Get acquainted with your account by reviewing the important terms below.

| IMPORTANT TERM | WHAT IT MEANS TO YOU | OUR RESPONSIBILITY |
|---|---|---|
| Credit Access Line | You are responsible for balances on your account including amounts charged in excess of your credit access line. We may also refer to credit access line as credit line or credit limit. | We will assign a credit access line to your account, and post it on your monthly billing statement. We may cancel, change or restrict your credit availability at any time. Each transaction is considered for approval on an individual basis, including those above the credit access line. We may not approve all transactions. |
| Authorized Users | You are responsible for any use of your account by an authorized user or anyone else that you permit to use your account. You must notify us if you want them to stop using your account. You also are responsible for getting any cards, checks or other means of accessing your account from the authorized user. | If you request, we may issue cards that access your account to your authorized users. If you wish to terminate an authorized user, we may close your account and open a new account with a different account number. |
| Annual Membership Fee | If your account has an annual fee, you are responsible for it every year your account is open or until your account is closed and paid in full. Your monthly billing statement will tell you how to cancel your account and avoid future annual fees. | If your account has an annual fee, we will add your annual fee to your monthly billing statement once a year, whether or not you use your account. Your annual fee will be added to your purchase balance and may incur interest. |
| Amendments | **We may change the terms of this agreement including APRs and fees from time to time. We may also add new terms or delete terms. APRs or other terms may also change without amendment, for example when the Prime Rate changes. See the Variable Rate section for details.** | **Our ability to make changes to this agreement is limited by applicable law.** |

EXHIBIT A

FILED DATE: 7/12/2021 3:58 PM    2021L007046

# IMPORTANT DEFINITIONS

| TERM | WHAT IT MEANS |
|---|---|
| Cash-like Transactions | The following transactions will be treated as cash advances: purchasing travelers checks, foreign currency, money orders, wire transfers or similar cash-like transactions; purchasing lottery tickets, casino gaming chips, race track wagers or similar betting transactions; and making a payment using a third party service. |
| Payment Due Date | Payments are due on the payment due date shown on your monthly statement. The monthly statement also explains when the payment must reach us in order to be considered received as of that date. Payments received after the required time will be credited on the next business day. |
| Variable Rate | We calculate variable APRs by adding a margin to the highest U.S. Prime Rate published in the Money Rates section of *The Wall Street Journal* two business days (not weekends or federal holidays) before the closing date shown on your billing statement. The APR may increase or decrease each month if the Prime Rate changes. Any new rate will be applied as of the first day of your billing cycle during which the Prime Rate has changed. If the APR increases, you will pay a higher interest charge and may pay a higher minimum payment. The Prime Rate is simply a reference index and is not the lowest interest rate available. If *The Wall Street Journal* stops publishing the Prime Rate, we will select a similar reference rate. |
| Default | Your account will be in default if:<br>1) You do not pay at least the minimum payment when due; 2) You fail to comply with this or other agreements with us or one of our related banks; or 3) We believe you may be unwilling or unable to pay your debts on time; you file for bankruptcy; or you become incapacitated or die.<br>If your account is in default, we may close it without notice and require you to pay your unpaid balance immediately. We can also begin collection activities. To the extent permitted by law, if you are in default because you have failed to pay us, we will require you to pay our collection costs, attorneys' fees, court costs, and all other expenses of enforcing our rights under this agreement. |

EXHIBIT A

| **Getting Started** | Using Your Card | Paying Us Back | What Happens If...? | Additional Information |

FILED DATE: 7/12/2021 3:58 PM 2021L007046

## USING YOUR CARD

You can use your account in the following ways. Your account is to be used only for personal, family or household purposes. You cannot use your account for illegal purposes, such as Internet gambling and writing checks against uncollected funds.

| TRANSACTIONS | WHAT IT MEANS TO YOU | OUR RESPONSIBILITY |
|---|---|---|
| Purchases | You may use your account to buy goods and services. | We authorize charges to your account in accordance with the terms of this agreement. |
| Balance Transfers | If eligible for a balance transfer, you can transfer balances to your account by using balance transfer checks, visiting our website or calling us. | We permit balance transfers from most non-Chase accounts. We do not permit balance transfers from other accounts or loans with us or any of our related banks. |
| Cash Advances | You may obtain cash from automatic teller machines, at banks or by using cash advance checks. Unless we say otherwise, balance transfer checks or promotional checks made payable to cash or yourself will be treated as cash advances. | We treat certain other transactions as cash advances. See the Cash-like Transactions section under Important Definitions above. |
| Checks | For your protection, balance transfer and cash advance checks must be signed by the person whose name is printed on the checks. | We may provide balance transfer checks and cash advance checks for your use; we have the right not to pay a check for any reason. |
| Automatic Charges | You may set up scheduled and repeat transactions to your account. If your account is closed or suspended, or your account number changes, you will need to contact any persons that you are paying by automatic transactions. | We are not responsible for scheduled and repeat transactions if your account is closed, suspended or the account number changes. |
| Promotions | You may receive special offers related to your account. | Any special offer is subject to this agreement, unless explained otherwise. |

EXHIBIT A

FILED DATE: 7/12/2021 3:58 PM    2021L007046

| | | |
|---|---|---|
| **Foreign Transaction Fee and Exchange Rate** | There is a fee, unless "None" is stated in the Rates and Fees Table, for transactions that are made in a currency other than U.S. Dollars. Our fee is a percentage of the U.S. Dollar amount of the transaction. Please see the Rates and Fees Table for the amount of this fee, if any. | • If a transaction is in a foreign currency, Visa International or MasterCard International will convert the transaction into U.S. dollars using their own currency conversion procedures, and then will send us the transaction amount. The exchange rate will be determined using either the range of rates available in the wholesale currency markets for the processing date (which may be different from the rate the card association receives) or a government-mandated rate in effect on that date. The exchange rate used by Visa or MasterCard may differ from the rate on the date of your transaction.<br>• In the case of returned or exchanged merchandise that was purchased in a foreign currency, the exchange rate is determined on the date of the return. |
| **Authorization of Transactions / Closing Your Account** | We are not obligated to honor every transaction, and we may close or suspend your account. Sometimes we close accounts based not on your actions or inactions, but on our business needs. | We may decline transactions for any reason, including: operational matters, the account is in default, or suspected fraudulent or unlawful activity. We are not responsible for any losses associated with a declined transaction. |

FILED DATE: 7/12/2021 3:58 PM   2021L007046

EXHIBIT A

4

## PAYING US BACK

You will receive a billing statement, if one is required, each month. It will show your minimum required payment.
After you make a payment, it may take up to 15 days to restore available credit on your account.

| IMPORTANT INFORMATION | WHAT IT MEANS TO YOU | OUR RESPONSIBILITY |
|---|---|---|
| Payment Instructions | You must follow the payment instructions on your billing statement. You can pay us by: check, money order, or electronic payment drawn on a U.S. bank or a foreign bank branch in the U.S. All payments must be in U.S. Dollars. You authorize us to collect any payment check either electronically or by draft. Payments marked "paid in full" must be sent to the Conditional Payments address shown on your billing statement. See your billing statement for complete payment instructions. | As long as you make your payment in accordance with the instructions on your billing statement by the date and time payments are due, we will credit your payment as of the same day it is received. We may accept and process any payments marked as "paid in full" without losing our rights. |
| Minimum Payment | You agree to pay at least the minimum payment when due. You also agree to pay amounts in excess of your credit access line when billed to your monthly statements or sooner if we ask. Minimum payments may include specific fixed payments that are part of special promotions. You can pay down balances faster by paying more than the minimum payment or the total unpaid balance on your account. | We will calculate your minimum payment based on the method described below the Rates and Fees Table. The minimum payment will appear on your monthly statement and includes any past due amounts. |
| Interest-Free Period (also called Grace Period) on Purchases | • The interest-free period is the time when you are not charged interest on new purchases.<br>• Your account is in an interest-free period when you pay your New Balance as shown on your statement every month by the due date and time. During this period, you will not pay interest on purchases.<br>• Balance Transfers, Checks and Cash Advances do not have an interest-free period. | • We do not charge interest on any part of the purchase balance that you pay while your account is in an interest-free period.<br>• We charge interest on purchases from the date the transactions appear on your account (until the balance is paid in full) when your account is not in an interest-free period.<br>• For more details about how we calculate your interest charges, see the Interest Charges section of this agreement. |

EXHIBIT A

FILED DATE: 7/12/2021 3:58 PM 2021L007046

| **Payment Allocation** | • When you make a payment, 12.42.17 we first apply your minimum payment to the balance on your monthly statement with the lowest APR.<br>• Any payment above your minimum payment would generally then be applied to the balance on your monthly statement with the highest APR first.<br>• If you do not pay your balance in full each month, you may not be able to avoid interest charges on new purchases. | We apply payments to balances as they appear on your monthly statement before being applied to new transactions. An example of a new transaction is a recent purchase you made that has not yet been included in the New Balance as shown on your statement. |
| **Credit Balances** | You may request a refund of any credit balance. | If you do not request a refund, we will apply any credit balance to new charges on your Account. If a credit balance remains on your account for 6 months and the amount is $1 or more, we will automatically refund it to you. If your credit balance is less than $1, it will be removed from your account but we will send the credit balance to you if you ask us to do so. |

FILED DATE: 7/12/2021 3:58 PM   2021L007046

6


EXHIBIT A



Certain transactions and situations may cause your account to receive a fee or have another impact on your account. The information below explains how you can avoid these outcomes. Amounts of these fees are listed in the Rates and Fees Table. The Rates and Fees Table indicates amounts "up to" certain limits for penalty fees because applicable law may restrict our ability to impose the full amount of the penalty fee in some circumstances. See the "Penalty Fees" provision below the Rates and Fees Table for additional detail reflecting limitations imposed under applicable law. Special services you request may incur additional service fees; be sure to carefully review the details of any additional services to understand the terms.

| "HOW TO AVOID..." | WHAT TO DO | WHAT IT MEANS |
|---|---|---|
| Late Fee | Ensure Chase receives at least the minimum payment shown on your billing statement when due. | If any payment is late, we may charge you a late fee. If the fee is based on a balance, we calculate the fee using the total balance at the end of the day the fee is charged. |
| Return Check Fee | Do not stop payment on cash advance and balance transfer checks, and do not default. | We may charge a return check fee if we stop payment on a cash advance check or balance transfer check at your request, or we refuse to pay a cash advance check or balance transfer check for any reason, including because your account is in default. |
| Return Payment Fee | Do not submit a payment that could be returned unpaid. | We may charge this fee if the payment you offer to us is not honored, is returned unpaid, or cannot be processed. |
| Collections | Do not default. | If you are in default, we may take the actions described above in the Default section under Important Definitions above. |

2021L007046

FILED DATE: 7/12/2021 3:58 PM

EXHIBIT A

# "WHAT HAPPENS IF…?"

Review this section for common situations or questions that might require action from you or Chase.

| "WHAT HAPPENS IF…?" | ACTION | WHAT IT MEANS |
|---|---|---|
| … I think I found a mistake on my statement? | We will investigate | Write to us within 60 days after the suspected error appears on your billing statement. We will investigate and contact you with our findings. Please see the Your Billing Rights section below for more details. |
| … I'm dissatisfied with a credit card purchase? | We will research the problem | First, attempt to resolve the problem with the merchant. Then write to us about the purchase. We will research the problem and contact you with our findings. Please see the Your Billing Rights section below for more details. |
| … my card is lost or stolen? | Contact us immediately and stop using your account | If your card is lost or stolen, or you think someone used your account without permission, tell us immediately by calling the Cardmember Services number on your card or billing statement. We need your help to find out what happened and correct the problem. |
| … my account is closed or suspended? | You remain responsible for your balance | Even if your account is closed or suspended, you must still repay all amounts you owe under the account. |
| …I want to transfer a balance or make a cash advance? | Balance transfer or cash advance transaction fees apply | You will incur a transaction fee for these transactions. See the Rates and Fees Table for the amount of this fee. |

FILED DATE: 7/12/2021 3:58 PM 2021L007046

EXHIBIT A

8

9

## ABOUT OUR RELATIONSHIP

Maintaining a positive relationship with you is very important to us. Please review these terms to understand more about your account.

| IMPORTANT INFORMATION | WHAT IT MEANS |
|---|---|
| Communications | We may send cards, statements and other communications to you at any mailing or email address in our records. If more than one person is responsible for this account, we can provide billing statements and communications to one of you. When you give us your mobile phone number, we have your permission to contact you at that number about all your Chase or J.P. Morgan accounts. Your consent allows us to use text messaging, artificial or prerecorded voice messages and automatic dialing technology for informational and account service calls, but not for telemarketing or sales calls. It may include contact from companies working on our behalf to service your accounts. Message and data rates may apply. You may contact us anytime to change these preferences. We may also send an email to any address where we reasonably believe we can contact you. Some of the legal purposes for calls and messages include: suspected fraud or identity theft; obtaining information; transactions on or servicing of your account; collecting on your account; and providing you information about products and services. Notify us immediately of any changes to your contact information using the Cardmember Services address or phone number shown on your billing statement. |
| Telephone Monitoring | We may listen to and record your telephone calls with us and we may use your voice for verification. |
| Credit Information | We may obtain and review your credit history from credit reporting agencies and others. We may, from time to time, obtain employment and income data from third parties to assist us in the ongoing administration of your account. We may also provide information about you and your account to credit reporting agencies and others. We may provide information to credit reporting agencies about this account in the name of an authorized user. If you think we provided incorrect information, write to us and we will investigate. |
| Enforcement | We may enforce the terms of this agreement at any time. We may delay enforcement without losing our right to enforce this agreement at a later time. If any terms of this agreement are found to be unenforceable, we may still enforce the other terms. |
| Governing Law | **This agreement and your account will be governed by federal law, as well as the law of Delaware, and will apply no matter where you live or use this account.** |
| Assignment | We may assign your account, balances you owe, or any of our rights and obligations under this agreement. The third party is then entitled to any of our rights that we assign to them. |
| NJ Residents | All provisions of this agreement are valid, enforceable and applicable in New Jersey. |

EXHIBIT A

| Military Lending Act Notices | Federal law provides important protections to members of the Armed Forces and their dependents relating to extensions of consumer credit. In general, the cost of consumer credit to a member of the Armed Forces and his or her dependent may not exceed an annual percentage rate of 36 percent. This rate must include, as applicable to the credit transaction or account: the costs associated with credit insurance premiums; fees for ancillary products sold in connection with the credit transaction; any application fee charged (other than certain application fees for specified credit transactions or accounts); and any participation fee charged (other than certain participation fees for a credit card account). If you are covered by the Military Lending Act, notwithstanding anything to the contrary in this Agreement, to the extent required by the Military Lending Act, nothing in this agreement will be deemed a waiver of the right to legal recourse under any otherwise applicable provision of state or federal law. To receive this information and a description of your payment obligation verbally, please call 1-800-235-9978. |

FILED DATE: 7/12/2021 3:58 PM    2021L007046

EXHIBIT A

**Daily Interest Rates and Annual Percentage Rates may be found on the Rates and Fees Table.**

#### Periodic Interest Charge Calculation—Daily balance method (Including new transactions):

We calculate a daily balance for each type of transaction and use the daily balances to determine your interest charges.

We figure the "daily balance" for each transaction type as follows:

- We take the beginning balance for each day and add
  - any interest charge from the prior day (known as compounding of interest) and
  - any new transactions or other debits (including Annual Membership Fees, transaction fees, Penalty Fees, any other fees and unpaid interest charges).
- We subtract payments or credits, and treat any net credit balance as a zero balance.
- The result is the daily balance for each type of transaction.

We figure the interest charges on your account as follows:

- To get the daily interest rate for each type of transaction we divide the APR by 365. We may combine different transaction types that have the same daily interest rates.
- We multiply the daily interest rate by the daily balance for each transaction type for each day in the billing cycle.
- We add together the interest charges for each day in the billing cycle for each transaction type.
- If any interest charge is due, we will charge you at least the minimum interest charge shown on the Rates and Fees Table.

We add transactions and fees to your daily balance no earlier than:

- For new purchases, balance transfers or cash advances – the date of the transaction.
- For new cash advance checks or balance transfer checks – the date the payee deposits the check.
- Fees – either on the date of a related transaction, the date they are posted to your account, or the last day of the billing cycle, whichever we may choose.

The Balances Subject to Interest Rate for each type of transaction shown on your billing statement is the sum of the daily balances for that type of transaction divided by the number of days in the billing cycle. We may use mathematical formulas that produce equivalent results to calculate the Balance Subject to Interest Rate, interest charges and related amounts.

# EXHIBIT A

**YOUR BILLING RIGHTS: KEEP THIS DOCUMENT FOR FUTURE USE**
This notice tells you about your rights and our responsibilities under the Fair Credit Billing Act.

*What To Do If You Find A Mistake On Your Statement*

If you think there is an error on your statement, contact us *in writing* at the Customer Service address shown on your billing statement. In your communication, give us the following information:

- *Account information:* Your name and account number.
- *Dollar amount:* The dollar amount of the suspected error.
- *Description of problem:* If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us:
- Within 60 days after the error appeared on your statement.
- At least 3 business days before an automated payment is scheduled, if you want to stop payment on the amount you think is wrong.

You must notify us of any potential errors *in writing*. You may call us or notify us electronically, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question.

*What Will Happen After We Receive Your Written Communication*

When we receive your communication, we must do two things:
1. Within 30 days of receiving your communication, we must tell you that we received it. We will also tell you if we have already corrected the error.
2. Within 90 days of receiving your communication, we must either correct the error or explain to you why we believe the bill is correct.

While we investigate whether or not there has been an error:
- We cannot try to collect the amount in question, or report you as delinquent on that amount.
- The charge in question may remain on your statement, and we may continue to charge you interest on that amount.
- While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
- We can apply any unpaid amount against your credit access line.

FILED DATE: 7/12/2021 3:58 PM 2021L007046

EXHIBIT A

12

After we finish our investigation, one of two things will happen:

- *If we made a mistake:* You will not have to pay the amount in question or any interest or other fees related to that amount.
- *If we do not believe there was a mistake:* You will have to pay the amount in question, along with applicable interest and fees. We will send you a statement of the amount you owe and the date payment is due. We may then report you as delinquent if you do not pay the amount we think you owe.

If you receive our explanation but still believe your bill is wrong, you must contact us *in writing* within 10 days telling us that you still refuse to pay. If you do so, we cannot report you as delinquent without also reporting that you are questioning your bill. We must tell you the name of anyone to whom we reported you as delinquent, and we must let those organizations know when the matter has been settled between us. If we do not follow all of the rules above, you do not have to pay the first $50 of the amount you question even if your bill is correct.

*Your Rights If You Are Dissatisfied With Your Credit Card Purchases*

If you are dissatisfied with the goods or services that you have purchased with your credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the purchase. To use this right, all of the following must be true:

1. The purchase must have been made in your home state or within 100 miles of your current mailing address, and the purchase price must have been more than $50. (Note: Neither of these are necessary if your purchase was based on an advertisement we mailed to you, or if we own the company that sold you the goods or services.)
2. You must have used your credit card for the purchase. Purchases made with cash advances from an ATM or with a check that accesses your credit card account do not qualify.
3. You must not yet have fully paid for the purchase.

If all of the criteria above are met and you are still dissatisfied with the purchase, contact us *in writing* at the Customer Service address shown on your billing statement. While we investigate, the same rules apply to the disputed amount as discussed above. After we finish our investigation, we will tell you our decision. At that point, if we think you owe an amount and you do not pay, we may report you as delinquent.

Copyright ©2019 JPMorgan Chase & Co. All rights reserved.

EXHIBIT A

FILED DATE: 7/12/2021 3:58 PM   2021L007046

EXHIBIT A

FILED DATE: 7/12/2021 3:58 PM   2021L007046

CHASE

EXHIBIT A                                                CFB00693

**Executive Office**
3415 Vision Drive OH4-7120
Columbus, OH 43219

CHASE 

April 14, 2021

Larisa Elizondo
3 First National Plz., Ste. 4300
Chicago, IL 60602

**We have credited $86,185.06 during the dispute process**

Reference Number:    ECW200625-01515-R4

Dear Larisa Elizondo:

We are responding to Jeff Manning's dispute about charges for his credit card account ending in 6906. We appreciate the opportunity to assist your client.

We reviewed the information your client provided for ALIEXPRESS. Of the total disputed amount of $195,294.19 listed on your client's spreadsheet, credit adjustments totaling $86,185.06 have been made to your client's account.

We understand your client's concern about the dispute and appreciate his patience while we continue the dispute process. The merchant requires time to respond to the information provided. If his dispute is correct, your client's credits will become permanent. If the merchant proves that the charges are correct, we will reverse the temporary credits and your client will be responsible for the charges.

We have determined we are not able to dispute other charges listed in the spreadsheet. Several charges do not match our records, cannot be located in our system, or occurred beyond the time frame we are able to take action. Your client may have more success if he contacts the merchant directly or seeks other options outside of the dispute process.

CT Corporation Service receives all of our summons. You can locate the state-specific address to send a summons at ct.wolterskluwer.com/sop-locations. You can send a subpoena to:

JPMorgan Chase, National Subpoena Processing
7610 W. Washington St., Floor 1
Indianapolis, IN 46231-1335

If you have questions about this issue, please call James at 1-877-805-8049, extension 1050023703. We accept operator relay calls. If you have questions about other issues, please call us at the number below. Our office is available Monday through Friday from 8 a.m. to 6 p.m. Eastern Time.

Sincerely,

Card Executive Office
1-800-242-7399
1-847-787-5509 Fax; it is free from any Chase branch
chase.com

EXHIBIT B

Executive Office(Mail Code OH4-7120)
3415 Vision Drive
Columbus OH 43219



00060 MLP 056 001 10421 NNNNNNNNNNNN ECD_Other
**LARISA ELIZONDO**
3 FIRST NATIONAL PLZ., STE. 4300
CHICAGO IL  60602

April 14, 2021

EXHIBIT B